AO93 Search and Seizure Warrant

FILED ___
RECEIVED ___   LODGED ___
COPY ___

SEP - 3 2021

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY **NM** _____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

In the Matter of the Search of One Cellular Telephone:

1) Black Samsung Cell Phone, IMEI# 352945781359880

Case No. 21-1390MB

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

### As further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### As set forth in Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before ___9|17|2021___ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to any United States Magistrate Judge on criminal duty in the District of Arizona.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _9|3|2021 at 10:50am_   _____
                                                *Judge's signature*

City and state: _Yuma, Arizona_ _____   Honorable James F. Metcalf, U.S. Magistrate Judge
                                                *Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is a Black Samsung Cell Phone, phone number 52-4522172038, IMEI# 352945781359880, (hereafter the "SUBJECT CELLULAR TELEPHONE") The SUBJECT CELLULAR TELEPHONE is currently located at the HSI Yuma Evidence Vault in Yuma, Arizona.

This warrant authorizes the forensic examination of the SUBJECT CELLULAR TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

*Property to be seized*

1.      Any records and information found within the digital contents of the SUBJECT CELLULAR TELEPHONE that relate to violations of Title 8 United States Code, Sections 1324(a)(1)(A)(i) and (a)(1)(B)(i) (Bringing Illegal Aliens to the United States for Profit); and Title 8, United States Code, Sections 1324(a)(1)(A)(i) and 1324(a)(1)(B)(iv) (Bringing an Illegal Alien to the United States Unlawfully, Resulting in Death) including:

    a.  all information related to alien smuggling activity and benefits gained from committing this illegal activity;

    b.  all information related to coordinators, co-coordinators, scouts, guides, drivers, recruiters, and money launderers involved in alien smuggling (including names, addresses, telephone numbers, locations, or any other identifying information);

    c.  all bank records, checks, credit card bills, account information, or other financial records;

    d.  any information recording schedule or travel;

    e.  any records and information found within the digital contents of the SUBJECT CELLULAR TELEPHONE showing who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, correspondence, and phonebooks;

f.  evidence indicating how and when the cellular telephone was accessed or used to determine the chronological context of the cellular telephone access, use, and events relating to crime under investigation and to the cellular telephone user;

g.  evidence indicating the cellular telephone user's state of mind as it relates to the crime under investigation;

h.  evidence of the attachment to the cellular telephone of another storage device or similar container for electronic evidence;

i.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the cellular telephone;

j.  evidence of the times the cellular telephone was used;

k.  passwords and encryption keys that may be necessary to access the cellular telephone;

l.  records of or information about Internet Protocol addresses used by the cellular telephone;

m.  records of or information about the cellular telephone's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos;

3

photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone.

rofitAO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

FILED
RECEIVED ___ LODGED
___ COPY

SEP – 3 2021

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY UM DEPUTY

In the Matter of the Search of One Cellular Telephone:
Black Samsung Cell Phone, IMEI# 352945781359880

Case No.  21-1390MB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

### As further described in Attachment A

Located in the District of Arizona, there is now concealed:

The person or property to be searched, described above, is believed to conceal:

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
| --- | --- |
| 8 U.S.C. §§ 1324(a)(1)(A)(i) and (a)(1)(B)(i) | Bringing Illegal Aliens to the United States for Profit |
| 8 U.S.C. § 1324(a)(1)(B)(iv) | Bringing an Illegal Alien to the United States Unlawfully, Resulting in Death |

The application is based on these facts:

### See attached Affidavit of Raymond Haar

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Genevieve Ozark
*Gao*

RAYMOND A HAAR III   Digitally signed by RAYMOND A HAAR III
Date: 2021.09.02 19:16:45 -07'00'

*Applicant's Signature*
Raymond Haar, Special Agent, HSI
*Printed name and title*

Subscribed and sworn telephonically before me.

Date: _9|3|2021_

*Judge's signature*

Honorable James F. Metcalf, U.S. Magistrate Judge
*Printed name and title*

City and state: Yuma, Arizona

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is a Black Samsung Cell Phone, phone number 52-4522172038, IMEI# 352945781359880, (hereafter the "SUBJECT CELLULAR TELEPHONE") The SUBJECT CELLULAR TELEPHONE is currently located at the HSI Yuma Evidence Vault in Yuma, Arizona.

This warrant authorizes the forensic examination of the SUBJECT CELLULAR TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

*Property to be seized*

1.       Any records and information found within the digital contents of the
SUBJECT CELLULAR TELEPHONE that relate to violations of Title 8 United States
Code, Sections 1324(a)(1)(A)(i) and (a)(1)(B)(i) (Bringing Illegal Aliens to the United
States for Profit); and Title 8, United States Code, Sections 1324(a)(1)(A)(i) and
1324(a)(1)(B)(iv) (Bringing an Illegal Alien to the United States Unlawfully, Resulting in
Death) including:

    a.  all information related to alien smuggling activity and benefits gained from
committing this illegal activity;

    b.  all information related to coordinators, co-coordinators, scouts, guides,
drivers, recruiters, and money launderers involved in alien smuggling
(including names, addresses, telephone numbers, locations, or any other
identifying information);

    c.  all bank records, checks, credit card bills, account information, or other
financial records;

    d.  any information recording schedule or travel;

    e.  any records and information found within the digital contents of the
SUBJECT CELLULAR TELEPHONE showing who used, owned, or
controlled the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries, configuration files,
saved usernames and passwords, documents, browsing history, user profiles,
email, email contacts, "chat," instant messaging logs, photographs,
correspondence, and phonebooks;

2

f.  evidence indicating how and when the cellular telephone was accessed or used to determine the chronological context of the cellular telephone access, use, and events relating to crime under investigation and to the cellular telephone user;

g.  evidence indicating the cellular telephone user's state of mind as it relates to the crime under investigation;

h.  evidence of the attachment to the cellular telephone of another storage device or similar container for electronic evidence;

i.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the cellular telephone;

j.  evidence of the times the cellular telephone was used;

k.  passwords and encryption keys that may be necessary to access the cellular telephone;

l.  records of or information about Internet Protocol addresses used by the cellular telephone;

m.  records of or information about the cellular telephone's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos;

photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your affiant, Raymond Haar, being first duly sworn, hereby deposes and states as follows:

### I.   INTRODUCTION AND AGENT BACKGROUND

1.    Your affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to examine the cellular telephone further described in Attachment A (the "SUBJECT CELLULAR TELEPHONE"), and in order to extract the electronically stored information set forth in Attachment B, which represents evidence and/or instrumentalities of the criminal violations further described below.

2.    I am a Special Agent with Homeland Security Investigations (HSI), and have been since 2018.  Your Affiant is an investigator/law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) –an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 19, United States Code (customs law), Title 8, United States Code (immigration law), Title 21, United States Code (narcotics law) and Title 18, United States Code (federal criminal law generally).

3.    Prior to my employment with HSI, I was employed with the Miami-Dade Police Department in Miami, Florida from 2008 to 2018. I attended the Miami-Dade Public Safety Training Institute for my basic law enforcement training. While employed with the Miami-Dade Police department, I was assigned to a variety of different units. I conducted road patrol, was a member of the Priority Services Unit, and was a member of the Crime Suppression Team, where I was an undercover detective doing narcotics buys and engaging in proactive enforcement. More notably, I was assigned to the Robbery Intervention Detail (RID) as a detective from 2013 to 2018. As a member of RID, I worked closely with our

Robbery and Homicide Bureaus, as well as local, state, and federal partners in investigating, targeting, and apprehending violent felons.

4.      From 2010 to 2018, I served as a member of the Florida Army National Guard (FLARNG). I attended basic training in Fort Jackson, South Carolina, Officer Candidate School in Camp Blanding, Florida, and Infantry Basic Officer Leadership Course in Fort Benning, Georgia. The highest rank that I attained was that of Captain. While serving in the FLARNG, I was deployed to the Horn of Africa, where I was the Executive Officer of my Company, which included over sixty soldiers who were responsible for guarding the Port of Djibouti and conducting infantry missions throughout the Horn of Africa. Midway through deployment, our Company Commander was injured, and I became the interim Company Commander tasked with running the company, planning real world and training missions, and ensuring the overall morale of the Company was intact.

5.      I also attended Florida International University in Miami, Florida where I obtained a Bachelor of Science in Criminal Justice with a Minor in Sociology in 2010.

6.      The statements contained in this Affidavit are based on information derived from your Affiant's personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; information provided by a confidential source; analysis of public records; analysis of social media information; and analysis of telephone records.

7.      Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all of the relevant facts known to law enforcement officers.

2

## II.    BASIS FOR PROBABLE CAUSE

8.    On the early morning of August 1, 2021, agents at the U.S. Border Patrol (USBP) Station in Yuma, Arizona received a telephone call from Lucero Onofre-Andres, who stated that she was with an individual named (later identified as L.F.R.) and two other separated individuals (later identified as Juan Contreras-Ventura and Rafael ALMANZA-Guillen) who were lost without food or water. USBP Agents (USBPAs) were dispatched at approximately 3:15 a.m. to help locate the lost individuals.

9.    At approximately 4:20 a.m. that morning, USBPAs encountered the female caller, Onofre-Andres. At approximately 7:45 a.m., they encountered Contreras-Ventura and provided him with medical aid. At approximately 9:20 a.m., USBPAs deployed additional resources including an emergency medical technician, and found a deceased male in the desert, who appeared to have died from exposure to the weather. The deceased was later identified as L.F.R. At approximately 9:30 a.m., USBPAs encountered and apprehended ALMANZA-Guillen.

10.    USBPAs transported Contreras-Ventura and Onofre-Andres to the Yuma USBP Station for further processing and investigation. ALMANZA-Guillen was transported to the Yuma Regional Medical Center (YRMC) for observation and treatment for hot weather injuries.

11.    HSI Agents responded to YRMC to interview ALMANZA-Guillen. ALMANZA-Guillen was read his *Miranda* rights in the Spanish language[1] by USBPA Lopez. ALMANZA-Guillen subsequently waived his rights, signed a waiver form, and agreed to speak with agents. HSI Special Agent B. Sumner and I witnessed ALMANZA-Guillen waive his rights and we also signed the waiver form.

---

[1] ALMANZA-Guillen is a native Spanish speaker.

12.     During the interview, ALMANZA-Guillen, a citizen of Mexico, claimed that he was originally with a group of eight individuals who attempted to enter the U.S. from Mexico. ALMANZA-Guillen stated that he burnt a bush to get the attention of USBPAs because the group ran out of food and water. ALMANZA-Guillen claimed that "El Tavo" is the name of the suspected smuggler and ALMANZA-Guillen was paying him $8,000 to cross into the United States. ALMANZA-Guillen was asked if he was the "coyote" or "pollero" (slang terms for smuggling guide) and he advised he was not. ALMANZA-Guillen was asked if he knew who the guide was and he said he did not know, but that he became separated from the group because he stayed with another individual he knew as "Juan" (later identified as Contreras-Ventura), who was feeling ill. ALMANZA-Guillen was asked how the group navigated the desert and he stated that the guide said to follow him. ALMANZA-Guillen said that USBPAs eventually found him and he advised them of the sick group member. ALMANZA-Guillen was asked how he was able to navigate after he became separated from the group; he stated he used the city lights as a guide. According to ALMANZA-Guillen, the group was supposed to be picked up somewhere in Yuma, Arizona. ALMANZA-Guillen was asked if he had a cellphone and he stated he did not. YRMC eventually cleared ALMANZA-Guillen for release and he was transported to the Yuma USBP Station.

13.     Contreras-Ventura (a material witness) was interviewed at the USBP Station in Yuma. According to Contreras-Ventura, he is a citizen of Mexico. Contreras-Ventura stated he took a flight from Michoacan to Tijuana, then a bus from Tijuana to San Luis, Mexico with his foot guide in an attempt to make entry into the U.S. Contreras-Ventura stated he was charged $9,000 to make entry into the U.S. Once Contreras-Ventura arrived in San Luis, Mexico, he stayed at the Hotel California to wait for the rest of the group. The foot guide, whom he knew as "Pipilas," advised the group that they would walk at night for three days to make entry into the U.S. The foot guide advised Contreras-Ventura to

bring 8-10 liters of water for the trip. On the evening of July 31, 2021, Contreras-Ventura stopped to rest because he was not feeling well. At that time, Onofre-Andres and L.F.R. kept going. According to Contreras-Ventura, "Pipilas" stopped briefly and then left him. Contreras-Ventura later flagged down USBPAs.

14.    HSI Agents showed a photo-lineup of six different males to Contreras-Ventura. Agents advised him to look at it and see if he recognized anyone. Agents advised him that the guide may or may not be in the photos. Contreras-Ventura positively identified photo number three as the guide, "Pipilas," which was a photo of ALMANZA-Guillen.

15.    HSI Agents also interviewed Lucero Onofre-Andres (another material witness). According to Onofre-Andres, she is also a citizen of Mexico but moved to Mexicali, Mexico recently in attempt to cross into the U.S. According to Onofre-Andres, her aunt made arrangements to have Onofre-Andres smuggled into the U.S. for a fee of approximately $8,500 to $9,000. Onofre-Andres stated that she traveled with a group that included "Juan" (Contreras-Ventura) and L.F.R., and that the group was led by a guide called "Pipila." According to Onofre-Andres, "Pipila" came across with the group and advised them to buy water. He also provided additional water for the group. The guide told the group they would walk for three nights. According to Onofre-Andres, the guide would lecture the group for drinking too much water, but was more rough with the men in the group. On the evening of July 31, 2021, Onofre-Andres stated that "Juan" (Contreras-Ventura) had to stop walking, and the guide stated he would take Contreras-Ventura back to Mexico and advised Onofre-Andres and L.F.R. to continue. According to Onofre-Andres, the guide gave her his cellular telephone (the SUBJECT CELLULAR TELEPHONE) to navigate. Onofre-Andres stated the foot guide advised her to use Google Maps and that the location she was supposed to travel to would be marked in Google Maps. The guide also advised her to make contact with "Luna Taxi," as they would be picking

5

the group up. Onofre-Andres tried to use the SUBJECT CELLULAR TELEPHONE to call for help but could not get a signal. At that time, she left L.F.R., walked as far as she was able to in order to obtain a signal, and called "9-1-1" for help. She told emergency services that the group was lost without food and water. Onofre-Andres stated that USBPAs eventually found her and brought her to the USBP Station in Yuma after unsuccessfully searching for L.F.R.

16.     At the end of the interview, HSI Agents produced a photo-lineup of six different males and showed the lineup to Onofre-Andres. Agents advised her to look at it and see if she recognized anyone. Agents advised her that the guide may or may not be in the photos. Onofre-Andres then positively identified photo number three as the guide, "Pipila," which was a photo of ALMANZA-Guillen.

17.     ALMANZA-Guillen was presented with the SUBJECT CELLULAR TELEPHONE (which Onofre-Andres stated had been given to her by the guide). ALMANZA-Guillen stated that he was the true owner of the SUBJECT CELLULAR TELEPHONE and gave agents consent to search it.[2] Within the Google Maps application on the SUBJECT CELLULAR TELEPHONE were several recent locations in Yuma, Arizona, including the Barry M. Goldwater Air Force Range, where the group was encountered by USBPAs. The call log on the SUBJECT CELLULAR TELEPHONE showed several calls to "Luna Taxi" between July 28, 2021 and August 1, 2021—this timing is consistent with the group's movement though the desert.

18.     ALMANZA-Guillen, Onofre-Andres, Contreras-Ventura, and L.F.R. are not citizens of the United States and do not have authorization to be in the United States. Further, none of the aforementioned individuals were brought to a designated port of entry

_____

[2] ALMANZA-Guillen signed a consent-to-search form.

or place other than as designated by the Commissioner.  Rather, ALMANZA-Guillen guided three persons through the desert when bringing them into the United States.

19.     The   SUBJECT   CELLULAR   TELEPHONE   was   seized   from ALMANZA-Guillen at the USBP Station in Yuma, Arizona on August 1, 2021, during the investigation of the human smuggling event that resulted in L.F.R.'s death.  The SUBJECT CELLULAR TELEPHONE is currently in the lawful possession of HSI.  Although HSI may already have the requisite authority to examine THE SUBJECT CELLULAR TELEPHONE, I am seeking a warrant out of an abundance of caution to assure that an examination complies with the Fourth Amendment.

20.     The SUBJECT CELLULAR TELEPHONE is currently in storage at the HSI Yuma Office.  In my training and experience, I know that the SUBJECT CELLULAR TELEPHONE has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT CELLULAR TELEPHONE first came into HSI's possession.

## III.   ITEMS TO BE SEIZED

21.     Based upon the facts contained in this Affidavit, I submit that there is probable cause to believe that the items listed in Attachment B will be found in the contents of the SUBJECT CELLULAR TELEPHONE.

22.     Based on my training, education and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, I know that certain characteristics are common among individuals involved in Alien Smuggling Organizations ("ASO").  Individuals involved in alien smuggling activity tend to:

a.     Retain records pertaining to financial transactions and the persons for whom the transactions are being conducted;

   b.   Collect data pertaining to other co-conspirators involved in alien smuggling activity, as well as monies owed and/or paid for illegal activity;

   c.   Possess and maintain records reflecting bank transactions and/or money transfers;

   d.   Maintain collections of records that are in a digital or electronic format in a safe, secure and private environment, including within electronic communication devices, such as the SUBJECT CELLULAR TELEPHONE;

   e.   Correspond with and/or meet with other alien smuggler associates;

   f.   Retain correspondence from other alien smugglers and co-conspirators relating to alien smuggling activity; and

   g.   Maintain lists of names, addresses, and/or telephone numbers of individuals with whom the alien smugglers have been in contact related to alien smuggling activity.

   23.   ASOs tend to utilize cellular telephones (such as the SUBJECT CELLULAR TELEPHONE) to communicate when conducting their illegal activity, utilizing voice, text, and electronic mail (if accessible) functions of the cellular telephone to do so. Therefore, evidence related to alien smuggling activity is likely to be found on the SUBJECT CELLULAR TELEPHONE.

   24.   In addition to items which may constitute evidence and/or instrumentalities of the crimes set forth in this Affidavit, I also request permission to seize any articles tending to establish the identity of persons who have dominion and control over the SUBJECT CELLULAR TELEPHONE.

IV.   **DIGITAL EVIDENCE STORED WITHIN A CELLULAR TELEPHONE**

   25.   As described in Attachment B, this application seeks permission to search for records and information that might be found in the contents of the SUBJECT

CELLULAR TELEPHONE. Thus, the warrant applied for would authorize the copying of electronically stored information under Rule 41(e)(2)(B).

26.     *Probable cause.* I submit that there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on the SUBJECT CELLULAR TELEPHONE for at least the following reasons:

      a.     I know that when an individual uses a cellular telephone, the cellular telephone may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The cellular telephone is an instrumentality of the crime because it is used as a means of committing the criminal offense. The cellular telephone is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a cellular telephone used to commit a crime of this type may contain: data that is evidence of how the cellular telephone was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

      b.     Based on my knowledge, training, and experience, I know that cellular telephones contain electronically stored data, including, but not limited to, records related to communications made to or from the cellular telephone, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

      c.     Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a cellular telephone, deleted, or viewed via the Internet.

9

Electronic files downloaded to a cellular telephone can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the cellular telephone until it is overwritten by new data.

        d.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the cellular telephone that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

       27.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the cellular telephone was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be found in the contents of the SUBJECT CELLULAR TELEPHONE because:

        a.      Data in a cellular telephone can provide evidence of a file that was once in the contents of the cellular telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

        b.      As explained herein, information stored within a cellular telephone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of

session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular telephone was remotely accessed, thus inculpating or exculpating the owner. Further, activity on a cellular telephone can indicate how and when the cellular telephone was accessed or used. For example, as described herein, cellular telephones can contain information that log: session times and durations, activity associated with user accounts, electronic storage media that connected with the cellular telephone, and the IP addresses through which the cellular telephone accessed networks and the internet. Such information allows investigators to understand the chronological context of cellular telephone access, use, and events relating to the crime under investigation. Additionally, some information stored within a cellular telephone may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The geographic and timeline information described herein may either inculpate or exculpate the user of the cellular telephone. Lastly, information stored within a cellular telephone may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

11

c.    A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how the cellular telephone was used, the purpose of its use, who used it, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a cellular telephone that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, cellular telephone evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one cellular telephone is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

28.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit imaging or otherwise copying the contents of the SUBJECT CELLULAR TELEPHONE, including the use of computer-assisted scans.

29.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V.    CONCLUSION

30.    This affidavit was sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose. I have thoroughly reviewed the affidavit and the attachments to it, and attest that there is sufficient evidence to establish probable cause that the items listed in Attachment B, which constitute evidence and/or instrumentalities of violations of 8 U.S.C. § 1324(a)(1)(A) (bringing in, transporting, and harboring of illegal aliens), are likely to be found in the contents of the SUBJECT CELLULAR TELEPHONE further described in Attachment A.

RAYMOND A HAAR III   Digitally signed by RAYMOND A HAAR III
Date: 2021.09.02 19:15:26 -07'00'

Special Agent Raymond Haar
Homeland Security Investigations

Subscribed and sworn telephonically before me this __3rd__ day of September 2021.

Honorable James F. Metcalf
United States Magistrate Judge

13